## FRED HARDEMAN v. STATE.

No. A-2933.   Opinion Filed November 23, 1918.

(175 Pac. 948.)

1.  **INDICTMENT AND INFORMATION—Demurrer—Separate Offenses.** In an information for burglary in the first degree, the breaking and entry may be charged with the intent to steal, and also with the intent to commit statutory rape, and such information is not subject to demurrer on the ground that it charges the commission of two separate offenses.

2.  **BURGLARY—Intent—Proof—Conviction.** Where an information charges the commission of burglary with different intents, a conviction may be had upon proper proof of the breaking and entry with either one of the intents charged, provided each of the intents charged relate to the same breaking and entry.

3.    **APPEAL AND ERROR—Conflicting Evidence—Review.** The guilt or innocence of a defendant is peculiarly within the province of the jury to determine, and when the jury renders a verdict of guilty, which is approved by the trial court, and there is evidence in the record to sustain the verdict, this court will not reverse the case because the evidence is in conflict.

4.    **INDICTMENT AND INFORMATION—Sufficiency in General.** Though an information be inartificially drawn, yet if it avers every essential element of the crime charged in intelligent language, so as to inform the defendant of what he is charged, such information is sufficient.

5.    **APPEAL AND ERROR—Assignments of Error—Abandonment.** Errors assigned in a petition in error, which are not argued or referred to in brief of defendant, will be regarded as abandoned and not considered.

6.    **TRIAL—Verdict—Absence of Defendant's Counsel.** The absence of the defendant's counsel from the court when the verdict of the jury is received, in the presence of the defendant, does not necessarily affect the validity of the verdict rendered.

7.    **TRIAL—Verdict—Conviction—Degree.** A verdict which finds a defendant guilty of burglary as charged in the indictment, if the indictment clearly charges burglary in the first degree, is sufficient, and is not vitiated by reason of the failure of the jury to find the degree of the burglary.

8.    **TRIAL—Argument—Penalty.** When, in the argument of a case, the county attorney states to the jury "that the punishment of seven years in the penitentiary is a heavy punishment, but they ought not to take that into consideration for the reason that about one-fourth of that could be knocked off for good behavior," he is within the realms of legitimate argument.

9.    **BURGLARY—Burglary in First Degree—Sufficiency of Evidence.** The evidence in this case carefully examined, and, though in conflict, found sufficient to establish the guilt of the defendant beyond a reasonable doubt.

*Appeal from District Court, Grady County;*
*Will Linn, Judge.*

Fred Hardeman was convicted of burglary in the first degree, his motion for a new trial was overruled, and he brings error.   Affirmed.

*Barefoot & Carmichael,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty Gen., for the State.

ARMSTRONG, J. The plaintiff in error, hereinafter designated defendant, was informed against for the offense of burglary, convicted, and sentenced, in accord with the verdict of the jury, to be imprisoned in the penitentiary for a period of seven years. Motion for a new trial having been overruled, defendant prosecutes an appeal to this court.

The charging part of the information is as follows:

"That Fred Hardeman did, in Grady county, and in the state of Oklahoma, on or about the 9th day of May, in the year of our Lord one thousand nine hundred and sixteen, and anterior to the presentment hereof, commit the crime of burglary in the manner and form as follows, to wit:

"That on or about said day and date, and in said county and state then and there being, the said Fred Hardeman did then and there willfully, unlawfully, feloniously, and burglariously and in the nighttime, without the consent of the owner thereof, break into and enter the dwelling house of one M. B. Waybright, in which said dwelling house there was at the time of said breaking and entering human beings, and in which there was kept and being goods and chattels, the personal property of said M. B. Waybright, with the willful, unlawful, felonious, and burglarious intent on the part of him, the said Fred Hardeman, to rape and carnally know one Gertrude Waybright, a female person under the age of sixteen years, and not the wife of him, the said Fred Hardeman, and with the willful, unlawful, felonious, and burglarious intent on the part of him, the said Fred Hardeman, to take, steal, and carry away by stealth, and without the consent of the owner thereof, the goods and chattels of the said M. B. Waybright so kept and being in said residence as aforesaid, with the willful, unlawful, and felonious intent on the part of him, the said Fred Hardeman, to appropriate the same to his own use and benefit and to deprive the true

owner thereof; that the said breaking into and entering the said dwelling house was done and accomplished by him, the said Fred Hardeman, by breaking the wire screen of, and raising an outer window of said dwelling house, contrary to the form of the statutes in such case made and provided, and against the peace and dignity of the state."

The defendant demurred to the information upon the grounds (1) that the facts alleged in said information are insufficient to constitute a crime against the laws of the state of Oklahoma; (2) that the same has a misjoinder of offenses, and that said information seeks to charge this defendant with the commission of two separate and distinct crimes. The court overruled said demurrer, and the defendant duly excepted.

The information is not so drawn as to meet with our approval as a model of pleading, but we do not think that it should yield to either ground of demurrer interposed thereto.

The information, we think, charges burglary in the first degree, charging that the unlawful breaking and entry was with the intent to steal, and also with the intent to rape and have carnal knowledge of a female under the age of 16 years, and, as having carnal knowledge of a female under 16 years of age is a felony when consummated with or without her consent, it is sufficient to aver in the information that an intent existed to have carnal knowledge of such female.

*Williams v. State,* 10 Okla. Cr. 336, 136 Pac. 599, cited and quoted by defendant, was not a case of statutory rape, as is the intent charged in the instant case, and hence said case is not in point in this case.

The information, though badly drawn, sufficiently pleads every element to charge the crime charged in in-

telligible language, and informs the defendant of the offense with which he is charged, and this is sufficient. *Teague v. State*, 13 Okla. Cr. 270, 163 Pac. 954; *Star v. State*, 9 Okla. Cr. 210, 131 Pac. 542.

The information charges a burglary, alleging two different intents with which the breaking and entry into the dwelling was made: (1) With intent to steal; (2) with intent to commit rape.

We are of the opinion that in the same count of an information different intents covering the one breaking and entry, and each intent charging a felony, as in the instant case, may be properly alleged.

We are unable to see why one who breaks into a dwelling house at night may not do so with the intent to steal, and also with the intent to commit rape, and be charged and legally convicted of having broken into and entered with one or both intents, as may appear from the evidence. It therefore appears that there is no misjoinder of offenses in the information, and the information does not charge the commission of two separate and distinct crimes.

The material evidence in the case is as follows:

Gertrude Waybright testified that when this happened she was 15 years old; that her birthday was May 22d; that at the time she was living with her father and mother; the house in which she lived fronted east and was on an alley; that she knew Fred Hardeman, and had known him about two years; that at the time it happened, which was on the 9th day of May, Fred Hardeman lived hardly the length of the building they were in from the house she lived in; that Fred Hardeman had never gone with her; that he had tried to, but

she would never go with him; that on the 9th day of
May she was in bed, and when she woke up at about
1:30 at night, Fred Hardeman had his hand under the
cover; "I felt the cover move, and I put my hand down on
his, and his hand was out flat, and I thought the wind was
blowing the cover, and I thought I would go to sleep again,
and he moved his hand again, and I felt down there and
felt his hand, and thought it was a snake, and then I got
up and turned on the light, and he was down under the
bed, and when I started to call mamma he stuck his head
up and grinned, and I said, 'Fred Hardeman, what are you
doing here?' and then I went to the door and called
mamma, and he left;" that there was a room east of her
room; that the window had a screen on it, which was torn,
and which was latched before he came in; that when she
first put her hand on his hand it was almost a foot from
her thigh; that the second time she touched his hand it
was eight or nine inches from her body, under the cover;
that when she turned on the light he ducked his head under
the bed so she could not see who it was, and that he did not
put his hand on her body; that he did not leave until she
called her mother, and when she called he ran out, making
lots of noise; that when she went to bed that night about
8:30 or 9 o'clock, and "It was, Mother said, about 1:30
o'clock when it happened"; that he did not have on any hat;
that she did not know how he was dressed, as she saw
only his shirt as he was down on his knees behind the bed;
that before she turned on the light she could just see it
was a man and thought it was her father; that she went
to her mother's room and called her, and Fred ran while
she was gone; he was wearing a white shirt with blue
stripes; that when she called her mother she knew it was
Fred; that she could not possibly be mistaken.

M. B. Waybright testified that he was the father of Gertrude, and on May 9th resided in Chickasha, Grady county, Okla.; that he remembered his daughter running into his and his wife's room on May 9th, and calling for her mother; that he heard some one running out of the house; that he ran east, and went out of the east window; that there was a screen on the window; that a hole was torn in it and it was unlatched; that when witness went to bed the window was up about ten inches, and when he heard the noise the window was clear up; that there was a door in the east room and it was locked; that Fred Hardeman lived in a house about 100 or 150 feet from where witness lived; he jumped out of the window and the screen slammed back; that there was a little hole in the screen big enough to put his hand in and unhook the screen; whoever went into the house did it; it was not that way the day before, because they kept the screens fixed up to keep out the flies; witness ran to the door and it was locked; that he dressed and went over to the house in which defendant lived and knocked, and had some trouble in waking the inmates, and asked for Fred, and stated to Fred's father that the defendant had been trying to get his girl, and that the defendant's father said he was asleep in bed over there, and that witness did not see but heard defendant, and his father said it was impossible; that he had been there all the time since he came home. Witness further testified that he did not feel very kindly to the family since the father of Fred abused him about this case. Witness further testified that he told the father of Fred that he would not stand for this and intended to have him prosecuted.

Mrs. Minerva Waybright testified that she remembered an occasion just after midnight, about the 9th of

May, in 1916, of some one entering her daughter's room; just before her daughter turned on the light she heard a noise; that she was not entirely awake when the light was turned on; that she heard her speak; she said, "Fred, what are you doing in this· room; what are you doing here?" and witness heard him run out of the door—run out of the window, she should have said; he did not sound like a person who had on shoes; it was between 1 and 2 o'clock at night; she did washing for him the day before —two shirts—one was a soft shirt with a soft collar, and the other was a blue and white shirt with a turndown collar.

Mrs. Florence Brock testified that at the time of the trouble over at Mr. Waybright's in May she lived next to the store which her husband kept—just on the west side of the store—and Fred Hardeman lived on the east side of the store; she heard a noise back toward Mr. Waybright's; that she was awakened between 1 and 2 o'clock and heard a door or window slam and heard some one running; Mr. Waybright lived back of her, and the running seemed to come from that way.

Thereupon the defendant demurred to the evidence, which was overruled and exception saved.

W. E. Hardeman testified that he was the father of defendant; that the family consists of himself and his two sons, Fred and Osie Hardeman; that on the 9th day of May, 1916, he lived on Iowa avenue between 8 and 9; that he knew Mr. and Mrs. Waybright; that they lived south of him on the alley; they lived one lot west of him and back near the alley; that there are two rooms to his house—one about 14 feet square and the other about 8x14 feet; that he used the 14-foot room for a bedroom; his bed

was on the east end of the room and the boys' bed on the west end; that the boys slept in the same room with him; they slept together; their beds were three or four feet from his bed; that Fred came in between 9 and 10 o'clock that night and went to bed; that he slept with Osie; that Fred did not get out of bed that night at all; that witness did not go to sleep until a right smart while after he came in; that Osie came in a little earlier than Fred; that he had hardly got in bed when Fred came; that something close to 1 o'clock Mr. Waybright came over and knocked on his door and he asked who it was; that he got up and went to the door and asked what was the matter; that Waybright asked if Fred was there, and he told him he was and asked him what he wanted; Waybright said that Fred had been around and tried to break into his house about 10 minutes before to get his girl; that witness said, "No, I guess you are mistaken;" then he turned around this way, and said, "Yes, he was; the folks saw him through the window;" witness said he could not have seen him because he was at home then; that Waybright said he could not stand for that; that he was going to have him arrested, and witness said for him to go ahead; that the boy was here in bed; that witness went and put his hands on the boy and he was in bed, but Waybright would not believe it, and he said to call him himself; that Waybright called him once or twice and Fred answered; that Fred was undressed and in bed when Waybright got there; that it was possible for Fred to have come in without witness' knowing it, but most of the time he did know; that Waybright said the folks saw him through the window, trying to break into his house; Waybright did not tell witness Fred had broken into his house; that Fred was not

out of the house that night from the time he came in until next morning; that witness did not think he could have been—he never was; that he was easily awakened—had been so all his life; that he was in a position to swear and would swear that Fred was not out of the house that night.

Osie Hardeman said he was a brother of defendant; that he was 14 years old; that he remembered the night of the 9th of May; that that night he went to bed about 9:30; that Fred went to bed and slept with him; he had been to the show that night, and got in home about 9:30, and Fred was at the show and came right in when he did or just after it, and he also went to bed; after he went to bed he stayed there all the time; that if he had gone out witness would have known it; that Fred had not been out of the room prior to the time that Mr. Waybright came over, and that he had not heard anybody run just prior to that time; that Waybright woke witness up hollering and Fred was in bed; that he woke papa first, and then woke witness and Fred up about the same time; that at that time Fred had off his clothes and was in bed with him; that he did not think it possible for Fred to have gotten up and gone out in his nightclothes and run back and gotten into bed with him without his knowing it; that Waybright hollered two or three times after he had awakened.

The defendant testified that he was 24 years old; that he had heard the testimony of Gertrude Waybright about his being in her room the night of May 9th; that he never was there that night or any other night; that she did not see him there at the time; that he and his little brother had been to the show and got back home, and he had gone to bed about 15 minutes before he went on to bed; that

he did not get up during the night; that he had not been up and out previous to that time; had not been out of the house at all; that he remembers his father coming to the bed with Waybright, and that he laid his hand on him and said to Waybright, "He is lying here, right here in bed asleep;" that he had never gone with the Waybright girl; that they were at the dam about a year ago; that he had tried to keep keep company with her two or three times, but she had not permitted it; that they were just passing acquaintances; there were just two beds in their room at home, which were about four feet apart; that his father occupied one and he and his brother occupied the other; that he heard no noise before Mr. Waybright came that night; that he pleaded guilty "here in court about a year ago" to stealing some chops out of Mr. Bell's barn; that on the 9th of May he got home about 10 o'clock, and that he did not go over to Mr. Waybright's that night at all; that he never had any intercourse with this Waybright girl, nor had he ever made such proposals; he asked her to go with him and she had refused.

M. B. Waybright, in rebuttal, testified that he did not state that night at the house of defendant that any of his people had seen Fred through the window, trying to break into the house.

There is no evidence whatever that the defendant broke into and entered the dwelling in question with the intent to steal.

It is earnestly insisted by the defendant that the evidence is not sufficient to support the verdict rendered, and this contention we cannot stamp with our approval.

It is true that the evidence is in conflict, but the only material evidence tending to deny the positive evidence

of the guilt of the defendant is that of the deefndant—a self-admitted convicted thief—and the attempted alibi set up by the evidence of the father and young brother of the defendant.

There is evidence that at midnight the defendant, a man of 24 years of age, entered the room where a young girl under 16 years was asleep, and when she awakened she discovered his hand under the covers on her bed, near her thigh; that upon being discovered the defendant, without explanation, ran off and left the house by a window which had been 'broken. Can there be any reasonable doubt that she was awakened by defendant's hand coming in contact with her person, that his hand was under her cover near her thigh, and that the intention of defendant was to have carnal knowledge of her, a girl under 16 years? Certainly not.

It therefore clearly appears that every ingredient constituting the offense with which the defendant is charged is shown by evidence which if believed by the jury, as they so say by the verdict, the verdict, though there be evidence in conflict therewith, is sufficiently supported by the evidence.

"As a general rule, the state may prove any conduct on the part of the defendant, or other fact or circumstance, by competent evidence ·which tends to show that the accused broke into and entered with the felonious intent alleged in the indictment; for generally the intent can only be shown by circumstantial evidence." (6 Cyc. 234-2.)

"And even where the felony was not actually committed, an intent to commit the same may be inferred from the time and manner in which the entry was made, or the conduct of the accused after the entry, or both." (6 Cyc. 245.)

"An intent to rape may be inferred, in the absence of evidence to the contrary, from the fact that the defendant broke and entered through the window of the sleeping room of a girl, put his hand upon her person, and upon her awakening left hurriedly, without explanation, or from other circumstances of a similar character." *(State v. Boone,* 35 N. C. 244. 57 Am. Dec. 555; *Harvey v. State,* 53 Ark. 425, 14 S. W. 645, 22 Am. St. Rep. 229; *State v. McBryde,* 97 N. C. 393, 1 S. E. 925; *State v. Powell,* 94 N. C. 965; *Dickson v. State* [Tex. Cr. App.], 64 S. W. 1043; *Ford v. State* [Tex. Cr. App.], 54 S. W. 761.)

"Where the evidence is conflicting, and on the part of the state such that, if believed by the jury, a verdict of guilty should result, the conviction should not be set aside on the ground that it was not warranted by the evidence." *(Jones v. State,* 12 Okla. Cr. 255, 154 Pac. 689.)

"A judgment will not be reversed on the ground that the verdict is contrary to law and the evidence, unless the appellate court finds as a matter of law that the evidence is insufficient to warrant a conviction." *(Browder v. State,* 12 Okla. Cr. 285, 155 Pac. 198.)

"The credibility of witnesses and weight and value to be given their testimony are questions solely for the jury's determination; and, to reverse judgment on the ground that the verdict is contrary to the law and evidence, this court must find as a matter of law that the evidence is insufficient to warrant the conviction." *(Piazzi v. State,* 13 Okla. Cr. 60, 161 Pac. 1176.)

In *Homer Gordon v. State,* 13 Okla. Cr. 117, 162 Pac. 444, it is said:

"The guilt or innocence of the defendant was * * * peculiarly within the province of the jury to determine, and when the jury renders a verdict of guilty, which is approved by the trial court, and there is evidence in the record to sustain the verdict, it will not be disturbed, in the absence of prejudicial error."

It is also earnestly insisted by the defendant that the verdict is fatally defective because it does not fix the degree of the burglary of which the jury found the defendant guilty, and with this contention we cannot agree. An inspection of the information shows beyond a reasonable doubt that the information charges burglary in the first degree.

In *State v. Hayes,* 23 S. D. 596, 122 N. W. 652, the Supreme Court of South Dakota. held:

"That a verdict finding accused guilty 'as charged in the information,' and fixing 'his punishment as death,' was not objectionable for uncertainty."

In *State v. Pepoon,* 62 Wash. 635, 114 Pac. 449, the Supreme Court of Washington said:

"The fourth contention is that a verdict of guilty as charged is not a sufficient finding of the degree where the statute requires the degree to be found by the jury. In addition to the facts discussed above, viz. that under the testimony no other degree of guilt could have been found by the jury, there is no difficulty in interpreting this verdict. It was as follows: 'We, the jury in the case of the State of Washington, Plaintiff, v. Geo. Pepoon, Defendant, find the defendant guilty of the crime as charged in the information.' So that it was just as certainly a verdict of murder in the first degree as though it had been so stated in so many words, and the court would have no. difficulty whatever in pronouncing the proper judgment. Any verdict which clearly indicates the conclusion reached by the jury is sufficient. *State v. McCormick,* 56 Wash. 469, 105 Pac. 1037."

In *Noble Bowlegs v. State,* 9 Okla. Cr. 69, 130 Pac. 824, Judge Doyle says:

"While the verdict in the case at bar is technically informal, it is sufficiently definite and certain as to the offense and the degree of which defendant was convicted,

and it is, in fact, a verdict of guilty of manslaughter in the first degree. We think the defect is not sufficient to affect the substantial rights of the defendant."

The verdict in the case read:

"We, the jury, * * * do upon our oaths find the defendant guilty * * * of manslaughter as charged in the indictment. *, * *""

However, the verdict was not excepted to, and this failure to except to the verdict is fatal to the contention "that the cause on account of alleged defect in the verdict should be reversed."

The defendant also complains that his counsel was not sent for upon the coming in of the verdict, and consequently was not present to take an exception; but fails to cite any authority "that receiving the verdict in the absence of the defendant's counsel constitutes prejudicial error," and after diligent search we have been unable to find a case in point. It cannot be questioned that the law requires the presence of the defendant in court when the verdict is received and read, but it does not require the presence of his counsel at such time. It may be, as averred by defendant, that it would be better for the clerk to notify counsel when the verdict is to be received, but this is a matter of courtesy, over which this court has no control.

Again, the defendant complains that the county attorney in his closing argument was guilty of a statement to the jury detrimental to the rights of the defendant and especially prejudicial to him by telling the jury "that the punishment of seven years in the penitentiary was a heavy punishment, but they ought not to take that into consideration for the reason that about one-fourth of that could

be knocked off for good behavior"; to which defendant objected, and requested the court to instruct the jury not to consider said statement, but the court did not so instruct the jury. We are of the opinion that the remarks of the county attorney were within the realm. of legitimate argument, as they merely stated a matter of law which all are presumed to know, and the contention "that this court would be acting in the interests of justice to reverse this case on account of such statement" is without the slightest merit.

The defendant assigns in his petition in error the refusal to give his requested instruction No. 1, and the giving of instructions Nos. 4, 6, 7, and 9 of the regular charge, respectively, but fails to argue, or even refer to, the same in his brief, and therefore the refusal to give and the giving of said charges will not be considered.

"Assignments of error, not presented in the brief" or upon "oral argument will be treated as having been abandoned and will not be considered by the court." (Price Patterson v. United States, 7 Okla. Cr. 272, 118 Pac. 150.)

"It is essential that all points upon which counsel rely for the reversal of a case be presented to the court in the brief or. oral argument, and when not so presented they are waived." (John Gonzalus v. State, 7 Okla. Cr. 444, 123 Pac. 705.)

However, we have carefully read said instructions refused. and. said instructions given, and fail to find any error therein which materially affects the substantial rights of the defendant.

"Instructions must always be considered in connection with the evidence in the case, and where they contain no fundamental error nor any misstatement of law which, in the light of the evidence, was calculated to mislead the

jury to the injury of the defendant, and where the evidence clearly shows that the defendant is guilty, a conviction will not be reversed because the charge of the court may not be technically correct." (Ostendorf v. State, 8 Okla. Cr. 363, 128 Pac. 144.)

The court did not err in overruling the motion for a new trial.

Finding no error sufficient to justify a.. reversal, the judgment is affirmed.

DOYLE, P. J., and MATSON, J., concur.