## JOHN CARRUTHERS v. STATE.

No. A-9088.   Oct. 23, 1936.
Rehearing Denied Nov. 13, 1936.
(63 Pac. [2d] 118.)

Guy P. Horton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Weldon Ferris, Co. Atty., for the State.

DAVENPORT, J.   In this opinion the parties will be referred to as they appeared in the trial court.   The defendant, John Carruthers, was tried for murder, convicted, and sentenced to imprisonment in the state penitentiary for life.   Motion for a new trial was filed, considered, overruled, and the defendant has appealed.

In substance the testimony is as follows: Dora Hunnicutt stated:

"On June 12th or 13th, 1935, I lived in Altus, Oklahoma, at 419 East Commerce, across the alley from Josie Shanks; we visited back and forth nearly every day; I was in Josie's house the night before we went to the party at Cat Wilsons; me and my husband, and Josie and John were all invited to the party; I went over to Josie's house for the purpose of dressing for the party; when we left to go to the party the house was all in order except the bed had not been made; on our way to the party we stopped at the hotel and Josie asked my husband to go in and tell John Carruthers she wanted to speak to him; when John came out Josie told John she had polished his shoes and wanted him to come to the party; Josie was dressed that evening in a white slip underneath her evening dress; we had a nice time at the party; it was conducted orderly and I did not see any misconduct; we drank some beer and then had something else. The defendant, John Carruthers, came to the party before we left, and talked to his wife who was also at the party; his wife went out and talked with him and he left in a taxicab; he did not leave with Josie and me.

"From the party we went to the beanery where Josie was talking to Carruthers; after that we visited two or three places and took some drinks at Big Sons; we stayed around there an hour or so and the deceased began crying; we left for home about four or four-thirty in the morning; John and Josie were together and walked behind me and my husband; John and Josie went across the alley to their home before my husband and I came into my house; my son Vernon, about twelve years old, opened the door for us to come in. The next thing I knew John was standing at the window knocking and telling us to get up, that Josie had killed herself.

"Some one called the police. Neither Josie, my husband or myself were drunk; Josie seemed to be happy and care free all that evening; John Carruthers had been going with Josie for some time. Josie had gone away from the parties a few minutes and changed her dress; she handed me the white dress she had on earlier in the

evening; she did not have any gun with her during the time we were at the different places after we left the party. When I reached the scene of the killing John Carruthers had the head of the deceased on his lap, rubbing or patting her cheek; I do not remember whether he was fully dressed or not."

Vernon Hunnicutt, the twelve year old boy, stated:

"I understand the meaning of an oath, and know right from wrong; I remember the night Josie Shanks was killed; I was living at Mr. Kizziar's place; I got up that morning and opened the door for father and mother; I took care of my little brothers and sisters while they were gone; when father and mother came in they went to bed; I layed down on a pallet, and the next thing I hears was a little racket, and then I heard a gun fire, and I heard Josie say, 'Oh John, don't hurt me.' I had heard Josie talk lots of times and knew her voice. I jumped up and stood by the lavatory just outside the door, and then ran over and looked in the door and saw John and Miss Josie; John had her head in his lap; her head was down stairs and her feet upstairs. I ran back and woke mamma. I heard John say, 'Wake up Josie, Josie done killed herself, the onliest woman I love.' "

Ivan Stout, a graduate engineer, testified to going down to the place about 10:30 or 11 o'clock the morning after the killing and making a plat of the place.

H. A. Savage, sheriff of Jackson county, stated: "I was called the morning of June 13th, 1935, about 5:20, and without dressing completely I hastened to the scene of the tragedy. I examined the body of the deceased, and her clothing, and could not find any powder burns. I told the defendant there at the time that he killed the girl; he denied it." Witness further stated that the gun was found in the crook of the arm of the deceased, and that the safety was locked.

F. B. Tims stated:

"I am a funeral director and undertaker; I was called to the scene of the tragedy, and found the body; there were no powder burns on the body or clothing. The bullet ranged down from its entrance."

Dr. Spears stated:

"I made an examination of the gun shot wound that caused the death of the deceased, Josie Shanks." Dr. Spears further stated "that the bullet entered to the left of the nipple and came out on the right side of the spine, angling about forty-five degrees. There were no powder burns on the body."

The defendant, John Carruthers, testifying in his own behalf, stated:

"I live in Altus; came from Texas to Oklahoma; on the night of the trouble I was working as a porter at the New Orient Hotel. Josie Shanks and the Hunnicutts came by the hotel where I was working, and later I went to the dance; Josie told me she had shined my shoes and arranged so I could dress and come to the dance.

"When I got down to the party it was about over; my wife Mollie was standing on the porch; I got out of the car and went as far as the ditch; Mollie watched me and so I started back, they told me the party was over; in returning to the car to go back to the hotel Mollie called me and I talked with her, she was trying to get me to go home, and I told her I had to go back to the hotel to work; as I started away Mollie hugged and kissed me and stood with her arm around my neck; Josie objected to me having anything to do with Mollie; I came back to the hotel after I had been to the dance; Dora and Josie came up to the beanery, which is a cafe concern and eating joint; I stopped the taxi cab in front of the beanery and Josie came out and asked me for a nickel, and she put it in the piano and played the record, 'In the Evening When the Sun Goes Down.' After the piece had been

played Josie began crying and wanted to go over to Rocks; there at Rocks we tried to play the piano and it would not play; Josie was standing in the lunch room with her head down and I said, 'Liven up and get with the crowd,' and Bill says, 'Yes, Josie, come on in here and I will give you a dress to put on,' as Bill thought Josie's dress was torn; Bill was the woman that stayed with Rock; the bunch of them were dancing, but I did not see Josie dancing. She changed her dress and came out and asked me to go with her to Big Sons, and sat down on the bench and was crying, the whole bunch was trying to get her to hush, we left and went to Big Sons place and went home. We had all been drinking and I drank a good deal.

"After my brother and his wife left the party, Josie, Dora and her husband and myself went to the hotel; we stopped and I told Josie I had better get back on the job, and she wanted me to go home with her; I stopped at the hotel and told her if I could get off I would catch up with them, I caught up with them. In going home we reached Josie's place before you get to the Hunnicutt home; when we got home I unlocked the door and went upstairs with Josie; she tried to play the radio but it was disconnected, and she went into the room and began to cry, and I asked what she was crying about; she said, 'Well, John, you come down there and hug and kiss your wife right before me, I couldn't stand it,' Josie told me, 'John, you have got to do one thing or the other, you have got to take me or Mollie,' and I said, 'Well, Josie, I wouldn't give Mollie and the children up for no woman I ever seen,' and asked her to lay down. I was in bed and dozed off to sleep. A shot woke me and when I woke Josie was standing at the head of the stairs and began falling down stairs, and I went on down behind Josie and picked her head up and put it in my lap, and said, 'Josie, look what you done,' and I said, 'Where are you hurt at, poor Josie, the onliest woman I love.' I got up and slipped on my breeches and went over and knocked on the Hunnicutt window, and told them to come over Josie had hurt herself bad, and I went back and put Josie's

head in my lap. Dora Hunnicutt came over and says, 'Poor Josie, I knew she had a gun.' I went upstairs and slipped on my shirt and shoes, came back and told the parties to call the officers. I was holding her when the sheriff came. It was my gun, I had been leaving it there at the house, Josie wanted it for protection when she stayed by herself. The gun shoots a steel cartridge caliber 380; when the gun is fired the cartridge flies out to the side of the gun and another one goes into the barrel. If you were facing west and pulled the trigger the shell would go north. I did not shoot Josie. I have been living with Josie off and on. From the time I heard the shot until Josie fell down the stairs she did not say a word; I could hear her breathing. I was asleep at the time the shot was fired; I did not see the Hunnicutt boy there at all.

"This gun has a safety catch on it and it operates up and down, just a slab on a hinge that pushes up and catches on the barrel that works back and forth. The safety is easy to operate. I did not pick the gun up after the shot was fired and put it on safety. I did not touch the gun."

On cross-examination witness stated:

"I told Josie, look what you done, I did not say, look what I have done. I think there was one shot fired from the gun; I did not shoot Josie nor did I wipe the finger prints off the gun; I did not put the gun on safety. Her husband comes over to see her often; I was not jealous of him. Josie committed suicide, the only cause I gave her was I told her I would not give up my wife, but she wanted me to quit my wife and children; I knew it was against the law to live with a woman I was not married to but negroes are not like white folks, nearly all negroes do that. My clothes were down at Josie's place. She fell all the way down to where the stairs turned; I don't know whether there were any bruises on her body or not; I did not pay any attention as to which hand she had the gun in; I did not give her any cause;

I cannot show by handling the gun how she shot herself as I did not see her shoot."

Mollie Carruthers testified in behalf of the defendant and stated: She and John had lived in Altus about seven years.

"We have four children; the night Josie was killed I attended a social function in the colored neighborhood with my brother and his wife; I saw John down at the house where the party was held and also Josie Shanks; I knew John had been living there part of the time. John came up to the house in a taxicab and I went out and asked him how he was feeling, and asked him if he was going to stay at the party; I told him I was having a nice time and that he ought to try to change his ways, and come on home to me and the children and take care of us as he should; just before he left I hugged and kissed him; Josie was standing on the porch; John left the party by himself. John has always provided 'for me and the family."

On further cross-examination witness stated:

"John and I did not have any trouble, I did not tell you in your office that I was glad this girl was out of the way. Yes, I am John's wife."

On cross-examination, H. A. Savage, the sheriff, stated:

"A party cannot hold this gun in their hands and shoot themselves without powder burning themselves; a person can place this gun right against their person and shoot like this from the left side, and it will come out through the body; you cannot put the gun so close to your person that it will not show powder burn; I have not tried it on a human being with clothes on but I have tried it on different things. Carruthers made a statement in my presence saying Josie was on the stairway facing east at the time the shot was fired, and said, 'Look what I done.' I never knew an automatic pistol to go off by

being dropped on the floor. I have known other pistols to be discharged by falling on the floor; I have never known an automatic not on safety to be thrown on safety by falling and jarring."

Ernest Hathaway, testifying for the state in rebuttal, stated he was a peace officer for five or six years; that he had considerable experience with pistols of the caliber of the one in question; this gun would powder burn the clothes of any one at a distance of eighteen inches or less.

The foregoing is the substance of the testimony introduced at the trial.

The defendant has assigned six errors alleged to have been committed in the trial of his case, but in his brief he argues only the sixth assignment, which is as follows:

"The verdict of the jury and sentence of the court is not supported by the evidence, and is contrary to the evidence in said case and that there is insufficient evidence to sustain said conviction."

The testimony introduced may be correctly summarized in brief as follows: The defendant had been living in adultery with Josie Shanks. They had been to a party that night and had been drinking a great deal and returned to Josie's room. The twelve year old negro boy, Vernon Hunicutt, says he heard a racket and a shot, and heard the deceased, Josie Shanks, say, "Oh, John don't hurt me." That he went over and looked in the Shanks house and ran home and called his mother. There was some conflict in the testimony as to who woke Dora Hunnicutt and her husband. They were aroused and went to Josie Shanks' room and there found her dead body, the defendant holding her head in his lap and saying, she was the onliest woman he loved. The gun was found in the

crook of the arm of the deceased on the stairway. It was an automatic pistol, and when picked up the safety was on. The doctor's testimony shows that the bullet entered below the left breast and passed out of the body to the right of the spinal column ranging downward from the point of entrance to the point of exit, and that there were no powder burns on the body. Other evidence tends to show there were no powder burns on the clothes. The defendant insists that the deceased was crying after they came home and he asked what she was crying about, and she told him he would either have to give up Mollie and the children or give her up, and he told her he would not give up Mollie and the children for any woman he ever saw.

He says he dozed off to sleep and was awakened by the shot, claiming the deceased had committed suicide. He admitted the pistol was his; that he had left it at Josie's house as she wanted it for protection when she was alone. No complaint is made by the defendant on the instructions of the court, and there are no errors in the record committed by the court on the question of the admission or rejection of the evidence. The testimony shows that the shell ejected from the pistol was over to the right and away from the stairway, and that when fired the pistol discharged the shell to the right and would throw another shell into the barrel. The record fails to disclose whether or not the deceased was left or right handed, and no expert testimony was offered to show it would be possible for the deceased to have held the gun with her right hand and inflicted the wound the testimony shows was inflicted on her body.

Section 3062, O. S. 1931, is as follows:

"On the trial of an indictment or information, questions of law are to be decided by the court, and the ques-

tions of fact are to be decided by the jury; and, although the jury have the power to find a general verdict, which includes questions of law as well as of fact, they are bound, nevertheless, to receive the law which is laid down as such by the court."

In Parnell v. State, 39 Okla. Cr. 361, 265 Pac. 660, this court in the first paragraph of the syllabus stated:

"Where there is evidence from which a jury may reasonably and logically find the guilt of an accused, the weight and credibility of such evidence is for the jury, who see and observe the witnesses, and this court will not substitute its judgment in such case for that of the jury."

In Hardeman v. State, 15 Okla. Cr. 229, 230, 175 Pac. 948, the court in the third paragraph of the syllabus stated:

"The guilt or innocence of a defendant is peculiarly within the province of the jury to determine, and when the jury renders a verdict of guilty, which is approved by the trial court, and there is evidence in the record to sustain the verdict, this court will not reverse the case because the evidence is in conflict."

In Wininger v. State, 55 Okla. Cr. 78, 24 Pac. (2d) 664, in the second paragraph of the syllabus, this court said:

"Before the Criminal Court of Appeals will reverse a conviction upon the ground that the verdict of the jury is contrary to the evidence, it must find there is no testimony in the record from which the jury could rationally conclude that appellant was guilty, unless it appears from the record that the jury were influenced by improper motives in arriving at their verdict."

In Pickett v. State, 35 Okla. Cr. 60, 248 Pac. 352, in the first paragraph of the syllabus, this court said:

"Where the evidence and the reasonable and logical inferences and deductions to be drawn from it are sufficient to convince the jury beyond a reasonable doubt of the guilt of a defendant, this court will not disturb the verdict for insufficiency." Choate v. State, 37 Okla. Cr. 314, 258 Pac. 360; Campbell v. State, 23 Okla. Cr. 250, 214 Pac. 738.

We are of the opinion that the state's evidence as summarized above and as it appears in the record in this case is amply sufficient to authorize the court in submitting the case to the jury, and to warrant the jury in reasonably concluding that the defendant was guilty of the crime charged, and the jury had sufficient evidence, though conflicting, to warrant it in returning the verdict it did.

The judgment of the district court of Jackson county sentencing the defendent to a term of life imprisonment in the state penitentiary, at McAlester, is hereby affirmed.

DOYLE, J., concurs. EDWARDS, P. J., absent, not participating.