## MAYBERRY v. STATE.

No. A-11325. Sept. 5, 1951.

Rehearing Denied Dec. 12, 1951.

(238 P. 2d 362.)

Lee Welch, Antlers, for planitiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, P. J. Plaintiff in error Frank Mayberry, defendant below, was charged by information in the district court of Pushmataha county with the crime of murder, Title 21, § 701, O. S. A. 1941. The information alleged the defendant with premeditated design did on September 14, 1948, shoot and kill George Haynes, his brother-in-law, by means of a double barrel 10-gauge shotgun. The defendant was tried by a jury, convicted of first degree manslaughter, his punishment fixed at 7 years in the penitentiary and judgment and sentence entered accordingly. From said judgment and sentence this appeal has been perfected.

The facts briefly were as follows: The alleged crime was committed in Pushmataha county. south and west of the town of Tuskahoma, near the Kiamichi River on a country road. The deceased was married to the defendant's sister. Their respective homes were only about a half a mile apart. The defendant's home was east of the deceased's place. Their farms extended north of their homes. The Kiamichi River traversed the farms of the defendant and the deceased George Haynes. On the morning of the day of the alleged crime, about 10:00 o'clock, George Haynes, the victim, and Roy Penny were building a new house. Mr. Penny it appears was on top of the house and Mr. Haynes was on the ground sawing some lumber. The defendant approached armed with a 22 rifle and spoke to Mr. Penny about having a new house soon. Thereafter, he said to Mr. Haynes, "Daud (referring to Mr. Haynes), your cattle are in my field over across the river". Mr. Haynes said, "Well, Frank, why didn't you get them out, you know I am busy". The defendant replied, "I aim for you to get them out", and thereupon began cursing, calling the deceased a son-of-a-bitch and otherwise abusing him. The record discloses deceased also cursed the defendant but not to the point of severity as employed by the defendant. Mr. Haynes apparently started toward defendant Mayberry but stopped when the defendant drew the 22 rifle on him telling him to come no further or he would kill him. The deceased told the defendant he would go and get his cows out of the defendant's field and went into the house. Mayberry left for his home. George Haynes got his double barrel shotgun, which the record discloses he was accustomed to taking to the field with him, and left for the corn field. Mr. Penny continued to work. The defendant went home and left the 22 rifle, arming himself with a double barrel shotgun loaded with No. 4 shot. In about 15 or 20 minutes Mr. Penny, Mrs. Haynes, Mr. Kirkland and Mr. Garvin, the state's witnesses, heard a gunshot coming from a northeasterly direction from the Haynes' home near the river. Mr. Garvin heard either 2 shots or one shot, he said, and an echo. They were close together he said. They also stated they heard the deceased's voice, it seemed calling for help. There were no eyewitnesses to the shooting, hence the state's case relative to what took place at the scene of the killing was largely circumstantial. Upon hearing the voice that sounded like Mr. Haynes' voice Mr. Penny got in his car and proceeded to the scene of the shooting. Mrs. Haynes had proceeded on foot down the road ahead of him. On the way he picked up Mr. Garvin and Mr. Kirkland, neighbors. Shortly thereafter he picked up Mrs. Haynes. Between the place of the shooting and the deceased's house they also picked up the defendant Mayberry who rode on the running board. Mayberry told them he had killed George Haynes. The record discloses that Mayberry had passed his house and was on the way to the Haynes home when he was picked up. Mrs. Haynes was "taking on" Mr. Penny said, and Mayberry told her to be quiet "or I will get you". No one else heard this. They finally got to the scene of the shooting and found the body. It was pitched forward on its

knees and face the gun under it "kinda hunkered up". The record discloses that an examination was made of the surroundings. It discloses a place behind a bunch of sycamore trees and a locust tree where some one had been sitting at the base of the locust tree. This was north and approximately 25 steps from where the body was found. There were 2 pools of blood, one at the body and another a short distance away. The larger pool of blood was located in the clear, behind some bushes. The smaller pool of blood where the body was found was behind a little cluster of sycamore trees. Where the person was sitting, the record shows, the trees were pretty thick, "covered with a good many leaves". From this position it appears the defendant could observe the decedent approaching. The cornfield was north of where the defendant was sitting about 30 steps. The defendant was betwen Haynes and the cornfield where the cows were supposed to be. Further examination disclosed the position where the defendant sat was in a direct line with the pool of blood in the clear, behind the bushes. There were trees to the south behind the large pool of blood. The condition of the leaves of these trees from the direction of where the defendant was sitting and the large pool of blood, indicated the shots were traveling from the point where the defendant was sitting. The trees to the south of where the deceased was shot bore marks of birdshot. It is apparent that the body was originally at the large pool of blood, that it was either moved after being shot or staggered after being shot. The defendant told deputy sheriff Wade the deceased staggered and then fell. There was some proof the deceased was heard begging the defendant to leave him alone after the gun shots were heard. The state's evidence was to the effect that no shot could be traced from the direction of the deceased to the place where the person was sitting behind the locust tree.

The defendant admitted to the sheriff he was sitting at the tree and was reported to have said "You can see where the shot went through the bushes". The defendant contended Haynes fired at him first and then he fired killing George Haynes. Mr. Winton, Mr. Shipman and Mrs. Shipman, neighbors to defendant Mayberry, said they heard 2 gunshots about 10:00 or 10.30 a.m. An examination of the deceased's gun showed a discharged shell in his gun, and an unfired shell loaded with buckshot. The defendant admitted the killing. He testified he had his gun on Haynes as he was coming along. He denied threatening Mrs. Haynes. He also denied making threats against the decedent Haynes, and particularly to Mrs. Prater, to the effect, "You go down and tell your God dam son of a bitch brother that I am going to kill him, too". The state proved in rebuttal by Mrs. Prater that the defendant did make such a threat in May, 1948. In his proof he laid considerable stress upon the proposition that medical proof was to the effect that the wounds upon the deceased's body were superficial, only skin deep, but the fact remains that George Haynes died as a result of them. He was hit in the face, head and chest by about 15 pellets. The record shows one pellet went into his eye. It does not appear which eye. The defendant offered evidence to the effect that he was a 50% disabled veteran of World War I. He offered this to show he was justified in taking the 22 rifle up to the Haynes' house in the first instance because he was afraid of the deceased's superior strength. This may be true, but it affords no justification for the defendant later arming himself with a shotgun loaded with No. 4 shot and proceeding to the point of the killing and laying in wait behind a tree for the deceased to appear. His explanation was that he often carried his shotgun, "I might see a squirrel or something". The defendant attacks the foregoing evidence as being insufficient to support the verdict, judgment and sentence. He contends it made out a clear case of self-defense. We are of the opinion that in view of the evidence in the record this attack is without merit. We believe that he was extremely fortunate in

not being found guilty of murder. In our opinion, the evidence would, have supported such a verdict. The defendant had virtually told the deceased he would not help to get the cows out of the cornfield, hence there was no reason for him going to the place of the killing at all, much less armed. Certainly, he was not there for the purpose of helping Haynes get the cattle out of the cornfield. It appears he had no other purpose in going other than that he was looking for trouble. If not, why did he wait behind the locust tree for 15 or 20 minutes? Again we say we believe the defendant's conduct and demeanor is such as would have supported a conviction for murder. The defendant is most fortunate. The verdict can only be explained in terms of the skill and standing of the defendant's counsel. In any event, the evidence was conflicting which presented a question for the jury. We have repeatedly held such situations are for the determination of the jury. Doser v. State, 88 Okla. Cr. 299, 203 P. 2d 451, and cases cited therein holding that where the evidence is substantial, though conflicting, the Criminal Court of Appeals will not reverse the case on the grounds of insufficiency.

Further the defendant complains of the form of the verdict in words and figures as follows, to wit:

"We, the jury, drawn, empaneled and sworn in the above entitled cause, do upon our oaths, find the defendant Frank Mayberry guilty, as charged in the Information and fix his punishment at 7 years in the penitentiary."

The defendant contends said verdict is defective in form in that it does not find the degree of homicide with which the defendant was found guilty. This contention is predicated on the provisions of Title 22, § 915, reading as follows, to wit:

"Whenever a crime is distinguished into degrees, the jury, if they convict the defendant, must find the degree of the crime of which he is guilty."

The provisions of Title 22, § 915, supra, have been interpreted contrary to the defendant's contention, and the California case upon which he relies, People v. O'Neil, 78 Cal. 388, 20 P. 705. He cites no Oklahoma decision in conformity with the California case. To the contrary this court has held in Bowlegs v. State, 9 Okla. Cr. 69, 130 P. 824, 825:

"There is a wide divergence of judicial opinion upon the question which this contention presents. The courts of several states have held without qualification that the degree of the crime must be specifically stated in so many words, and that it cannot be ascertained from the evidence, the instructions, or the punishment assessed. On the other hand, the courts of several states hold that, where the jury is required by statute to find the degree of the crime of which the defendant is guilty, a verdict which does not expressly state the degree is sufficiently definite and certain as to the degree of which the defendant was convicted, if the assessment of punishment clearly indicates such degree. * * *

"While the verdict in the case at bar is technically informal, it is sufficiently definite and certain as to the offense and the degree of which defendant was convicted, and it is, in fact, a verdict of guilty of manslaughter in the first degree. We think the defect is not sufficient to affect the substantial rights of the defendant. * * *"

In Stokes v. State, 86 Okla. Cr. 21, 189 P. 2d 424, 426, 190 P. 2d 838, we said:

"Failure of a verdict to name the degree of the offense of which the jury found the defendant guilty does not invalidate it, if, from the language of the verdict as a whole, no doubt can arise as to the offense of which he was convicted."

See, also, Gibson v. State, 89 Okla. Cr. 188, 206 P. 2d 238, and cases cited therein to the same effect. Also Munson v. State, 13 Okla. Cr. 569, 165 P. 1162; Hardeman v. State, 15 Okla. Cr. 229, 175 P. 948; Coleman v. State, 16 Okla. Cr. 579, 194 P. 282; Stansell v. State, 30 Okla. Cr. 265, 235 P. 937; Medley v. State, 81 Okla. Cr. 242, 162 P. 2d 881, 882. The foregoing Medley case holds that strict technical rules of construction should not be applied to the verdict of the jury, but verdicts "should receive a common sense construction, and, if it is possible to arrive at the intent and purpose of the jury, the verdict should be upheld". Here, looking at the information, the trial record, instructions of the court, and the verdict, the intent of the jury clearly appears to find the defendant guilty of first degree manslaughter and fix his punishment at 7 years in the penitentiary. However, good practice, when the defendant objected to the form of the verdict, would have been to require the jury to retire to the juryroom and to have corrected the verdict. Nevertheless, in light of the established law covering this case the error does not invalidate the verdict.

Defendant further contends the trial court erred in giving an instruction on first degree manslaughter, to which he excepted. While the evidence would have sustained a conviction for murder, we are of the opinion that it was not reversible error for the trial court to give an instruction on first degree manslaughter. In Welborn v. State, 70 Okla. Cr. 97, 105 P. 2d 187, in syllabus 1 and 2 this court said:

"In a prosecution for murder, the court should instruct the jury on the law of each degree of homicide which the evidence tends to prove, whether it be requested on the part of the defendant or not, and it is the duty of the court to decide, as a matter of law, whether there is any evidence that would tend to reduce the degree of the offense to manslaughter in the first degree.

"In a prosecution for murder, where the court submits the issue, and the jury find the defendant guilty of manslaughter in the first degree, although under the law and the facts the crime is murder, yet, if the defendant is convicted of a lower degree of homicide than that established by the evidence, no prejudice could have resulted to him and this court will not reverse a conviction because of such error".

Hence, because the jury found the defendant guilty of a lesser crime than the evidence supports affords the defendant no reason for complaint that the trial court instructed on first degree manslaughter. To the same effect is Fisk v. State, 62 Okla. Cr. 305, 71 P. 2d 499, in syllabus 1. Therefore, this contention must fail.

The defendant next contends it was error for the trial court to permit the defendant to be interrogated in regard to threats he made against the life of decedent Haynes which threats he denied while testifying for himself, but which were proven by rebuttal evidence. This contention is likewise without merit. In Mendenhall v. State, 18 Okla. Cr. 441, 446, 196 P. 736, 737, it was said:

"If threats were made by the plaintiff in error against the deceased shortly before the tragedy, evidence of such threats was properly submitted to the jury, for the purpose of determining the state of mind and the feelings of plaintiff in error toward the deceased at the time of the homicide, * * *."

See, also, Tuggle v. State, 20 Okla. Cr. 314, 209 P. 187, permitting rebuttal evidence such as is complained of herein, after proper predicate had been laid, as was done in the case at bar. McDaniel v. State, 8 Okla. Cr. 209, 127 P. 358. It is therefore apparent that this contention lacks merit.

Finally, the defendant contends the court erred in giving instructions 12, 13, 15, 18, 20. The record discloses defendant objected to each of said in-

structions, but nowhere does it appear he submitted requested instructions in aid of the court. The defendant cites no authority in support of this contention. We have examined the instructions and believe them to constitute a substantial statement of the law and that they did not result in a miscarriage of justice. In this regard this court has held, a conviction will not be reversed for misdirection of the jury, Title 22, § 1068, O. S. A. 1941, unless after examination of the record, it appears that the error resulted in a miscarriage of justice, or a denial of the defendant's constitutional and statutory rights. West v. State, 13 Okla. Cr. 312, 164 P. 327, L. R. A. 1917E, 1129; Stokes v. State, 86 Okla. Cr. 21, 42, 43, 189 P. 2d 424, 190 P. 2d 838, and cases cited therein. We do not believe a miscarriage of justice resulted from the court's instructions herein given. The defendant makes other assignments of error unsupported by authority and which we deem to be wholly unmeritorious. For all the foregoing reasons the judgment and sentence herein imposed is accordingly affirmed.

JONES and POWELL, JJ., concur.