# WOODS v. STATE.

No. A-11221.  July 12, 1950.

(220 P. 2d 463.)

George L. Hill and Kirksey M. Nix, McAlester, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, J.  The plaintiff in error, Thomas Woods, who will hereinafter be referred to as defendant, was charged in information in the district court of Pittsburg county with the crime of murder, was tried before a jury, convicted, and his punishment fixed at life imprisonment in the State Penitentiary, and judgment and sen-

tence in accordance was duly entered. Appeal has been perfected to this court.

The defendant at the time of the tragedy was an inmate of the State Penitentiary at McAlester, and the state furnished him with two able and experienced attorneys to conduct his defense, and the record in this case was prepared at the expense of the state.

The case was filed herein on April 8, 1949, and under the rules of this court a brief in support of petition in error should have been filed within 60 days. The case was set for oral argument on April 19, 1950, but was submitted on the record, and no briefs have been filed. This court has held in a long line of cases that where defendant appeals from judgment of conviction and no briefs are filed or argument presented, Criminal Court of Appeals will examine the evidence, not to discover errors in admission or rejection of testimony, but only to ascertain if it supports the verdict, and examine the pleadings, instructions, and judgment, and, if no material error is apparent, judgment will be affirmed. See Whitlow v. State, 85 Okla. Cr. 2, 184 P. 2d 253; Long v. State, 84 Okla. Cr. 445, 184 P. 2d 119; Parks v. State, 83 Okla. Cr. 70, 173 P. 2d 234.

We shall consider the sufficiency of the evidence.

The undisputed evidence developed that the defendant, on the 30 day of July, 1948, was incarcerated in cell 35 of the solitary confinement block, fourth floor, of the penitentiary. It appears that unruly prisoners are confined in this block as punishment for their disobedience. The doors to the cells are sliding and are operated from a lever box about three feet wide, a foot and a half deep, and four feet long, door in east end, located in this case at the east end of the cell block, which contains two rows

of cells with an aisle about five feet wide and 120 feet long and running east and west, with entrance from the east. It is possible to open one or all the doors by operating certain levers from this lever box.

The cell walls are of solid steel, are about nine feet long, five feet wide, and six and one-half feet to the ceiling, and the only opening for light and air is through the bars of the cell doors.

Howard Lewis, witness for the state, testified that he was working at the penitentiary on July 30, 1948, and worked on the tower on the wall outside the penitentiary, but for two nights had been assigned duty on the solitary confinement cell block to learn the duties so that he could work there during the vacation of other guards; that W. H. Aston, another guard, was breaking him in; that he had been on duty about two hours, that around 11 o'clock he was sitting on the rail beside the stairway to the cell block and that Mr. Aston was sitting in a chair north of the stairway, and Mr. Aston got up and told him to go and get the boy out of cell 35; that he went to the cell and that Mr. Aston caused the door to open, or as he termed it, "racked the door" from the lever box and the prisoner, being the defendant herein, came out, and witness said "Let's go" and witness followed defendant up the runway, but when they got to about 10 feet of the front door, Mr. Aston told him to take the prisoner back to the cell and he did so, and started back up front and met Mr. Aston 10 feet down the way and Mr. Aston gave witness the key to the lever box and told witness to unlock the door. Witness further testified:

"Q. Anybody on the runway besides you and Woods? A. No, sir. Q. All right, go ahead. A. He gave me the key and told me to go up and unlock the door and have

the lever-boy open 35 when he got down there, and so I waited for Mr. Aston to get down to 35 and I unlocked the lever-box and told the boy to open No. 35— * * * Q. You say Mr. Aston came down and stood at cell 35? A. Yes, sir. Q. About how far from the door was he standing? A. About three foot and a half. Q. From the front of the door which slides back? A. Yes, sir. Q. Which way did the door slide? A. Back west. Q. What did you do then? A. I had the door opened. Q. You opened this particular door? A. Yes, sir. Q. What happened? A. When the door come open the boy started out pulling up his sock, looked like. I seen there was going to be trouble—I couldn't understand what was said—good deal of racket and I couldn't hear. I pushed the lever-boy back and locked the door and started down there. About the time I started down there, he threw him against the well— Q. What was it this boy did? A. He put his hands on Mr. Aston's shoulders. Q. Put his hands on Mr. Aston's shoulders? A. Yes, and they went into a little tussel there, or scuffle. Q. Did Mr. Aston have a gas gun in his hand at the time he was standing in front of cell 35? A. No, sir. Q. Where were his hands? A. Down to the side. Q. When they started scuffling now, did he have the gun in his hand at that moment? A. No, sir, not to my knowing. Q. Did you see him get the gun out? A. No, I seen him reach but didn't see him get it. Q. Did you see the gun go off? A. Yes, about the time the gun went off and Woods grabbed him and throwed him against the wall— it all happened about the same time, pert near it. Q. You started down there? A. Yes, sir. Q. Did Mr. Aston have both hands or one hand on the gun when he fired it? A. Both hands. Q. Where was Woods' hands? A. On the old man. Q. On him? A. Yes, sir. Q. What happened when Woods threw Mr. Aston into the cell? A. He ran on back to the west end of the run-way. Q. What happened to Mr. Aston? A. He laid there on the walk after he fell. Q. He fell to the floor? A. Yes, sir. Q. How was he laying? A. On his left side with his face up toward the wall and his head facing the east. Q. Is

that on this side? A. Yes, sir. Q. Was the door to cell 35 back and the cell open? A. Yes, sir."

The witness then using the county attorney as Mr. Aston, demonstrated to the jury what he saw, and testified that Mr. Aston's head went up against the wall after passing over defendant's shoulder. Witness further testified that he tried to pull Mr. Aston out of the gas but that it strangled him so that he could not get him out and that witness ran and called for help, and that Sergeant Brown, Mr. Edge and Mr. Stacy came and the injured man was taken to the hospital.

Witness further testified that when standing in front of the lever-box one can't see down the hallway between the cells; that when he saw defendant attack Mr. Aston, witness pushed the "lever-boy", a trusty named Roy Thompson, out of the way to the south and locked the door to the lever-box as quickly as possible so that he could go to the aid of Mr. Aston.

The effect of the last part of this testimony was to show that the lever-boy had no opportunity of observing the encounter until after the deceased had been crushed to the floor.

Witnesses Elbert Edge and Claude Stark heard the gas gun explode and ran up the steps to the fourth floor and looked down the aisle between the solitary confinement cells and saw Mr. Aston lying down. Witness Edge further testified:

"Q. What did you do when you got there? A. Mr. Aston was laying on his left side with his gas gun by the side of his mouth and cheek there, and making a racket, trying to get his breath, and I rolled him back on his back and his watch he had in his shirt pocket, which he carried fastened in his button hole, it was laying out. I picked it up, put it in his pocket—the gas was get-

ting in our eyes pretty bad. Three of us picked him up, myself and the boy that worked up there, and Mr. Lewis, and we carried him out of this gas up to the front door up on sol. Q. Did you take him on to the hospital at the prison? A. Yes, sir. Q. Was Mr. Aston conscious or unconscious? A. He was unconscious at the time we picked him up. Q. Did you see any injuries on him? A. Yes, sir. Q. Where were they? A. He had an injury on the right side of his head behind his ear and above—the blood was running down the back of his neck and on his clothes."

Chief Sgt. Harland F. Brown testified that about 11 a. m., July 30, 1948, he was in the mess hall of the penitentiary, and glanced up and saw Mr. Edge run out to look to the fourth floor, and in a second or so Mr. Stark ran out, and just as he got to the door of the west cell house where they go up to solitary confinement on the top floor, that he met the defendant, Woods, coming down the south steps, that he was in his underwear and kind of staggering and tears were running down his cheeks and he took him and locked him up; and in about five minutes he saw others carrying Mr. Aston to the hospital. Mr. Aston was unconscious.

Dr. Paul Kerneck of St. Francis Hospital, Holdenville, testified that the deceased was brought to that hospital early in the afternoon of July 31, 1948; that he examined Mr. Aston; that he was unconscious; that they took two X-ray pictures of his head and that Mr. Aston had a blow on the right side of his head a little to the back of his right ear. He further testified that the X-ray pictures disclosed a skull fracture and that Mr. Aston on August 4th died from the effects of this fracture. They were unable to restore him to consciousness; that deceased at the time of his death was 66 years of age.

Counsel for defendant demurred to the state's evidence, and the demurrer was overruled.

For the defense, the defendant testified that the death of Mr. Aston was accidental. He testified on direct examination, in part as follows:

"Q. Where were you celling on the 30th day of July of this year at the time that Mr. Aston fell there in front of your cell? A. Cell 35, on four. Q. I want you to relate to the jury in your own words just exactly what occurred—I want you to tell the jury just what happened. A. Well, sir, like right in front of the door, I was laying there right in front of the door, pretty hot, and I was there where I could get pretty good breeze, and the boy right up in front of me was talking pretty loud, and in the meanwhile things got quiet all of a sudden. I already knowed Mr. Aston was coming down the runway when things get quiet like that, and I kinda glanced just about the next cell to me and happened to look up and he stopped there in front of my door and had his gas gun out and asked me for a mirror which they call a shiner. I told him I didn't have one. He said I did. I told him, 'No, I haven't' and he calls another guard up and he calls him and told him to stand at my door while he racked the door, and he stood there and the door opened and the guard had me out— Q. Have you seen that guard in the courtroom today? A. Yes, sir. Q. Was that Mr. Lewis? A. Yes, sir. Q. Mr. Aston went back down to the east end of the run? A. Yes, sir. Q. Then what happened? A. The door opened and the guard ordered me out. I came out and started up to Mr. Aston and got about half way where he was which was at the lever box, and he tells the guard to put me back. I goes back and after getting in my cell the door closed, and I was getting ready to lay back down and looked up and there Mr. Aston was there at the door. The door opened again, and he said 'are you going to give me that shiner you got?' and I said, 'I haven't got no shiner,'. He said, 'Boy don't lie to me I seen you with it.' He asked me out, I came out and had my

shirt on, my shoes and my shorts, and he asked me to get out of my shirt. I pulled my shirt off and he shook it down. He asked me for my shoes, meanwhile I knelt down to get one of my shoes off to hand it to him, and about that time he said he knowed I had a shiner, kept asking for it. I told him I didn't understand why some guards kept bothering—he said, 'you can't tell me how to run my business.' I told him 'I am not trying to tell you how to run your business, I'm telling you what's right'; and he said 'are you getting smart with me?' About that time he throwed the gun up like he was going to shoot me in the face with it. I throwed up my hands, like this, about the same time the gun went off and he hit me on this side, in here (indicating)—. I shoved him and I would really say run into him—I was really blind— Q. Could you see what you were doing or where you were going? A. I could see just a little bit out of my right eye. Out of my left eye I couldn't see at all. Q. Did you ever at any time strike him any blow. A. No. Q. Where did you run to? A. In going to the far end of the run, I got turned around, I thought I was going to the door, but I goes the other way. I heard the boys hollering, 'You are going the wrong way to get out.' I kinda glanced out of my right eye and saw I was going the wrong way. I turned around and come down and try to get to the doctor. Q. What condition were you in? A. The gas burned me, stings me, felt like I was on fire. Q. What condition was your eyesight in? A. At that time I couldn't see any out of my left eye, I could see a little bit out of my right eye. Q. How did you manage to get down the steps? A. This little I could see out of my right eye, I could see my way down the steps. Q. Is there a railing on the steps? A. Yes, sir. Q. Did you have any intention of injuring Mr. Aston, in any way whatsoever? A. No, sir."

Roy Thompson, who was serving 12 years for pandering and who was the lever-boy, helping operate the levers of the solitary confinement row and who guarded Howard Lewis, testified he had shoved out from in front of the lever-box and to the south when he noticed the scuffle

between defendant and the deceased, testified concerning the facts of the encounter substantially as the defendant and claimed to have witnessed Mr. Aston's "shaking down" the defendant for a small mirror called a "shiner."

On cross-examination witness denied telling the county attorney in the warden's office, and soon after the tragedy, that he did not see it as he was looking the other way.

Several other prisoners claimed to have seen parts of the "shake down" of defendant by the deceased. One witness, O. E. Decker, testified that he was in cell 69 and was using a "shiner" and saw Mr. Aston shoot his gas gun at defendant and that defendant covered his face with his hands and ran into Mr. Aston in getting away and caused the deceased to fall.

Witness Collett Holloway was in cell 37 and testified that he could see defendant and Mr. Aston and that the deceased shot the defendant with gas and that the defendant shoved deceased and ran.

The state on rebuttal offered the evidence of Cleve Palmer, assistant deputy warden, who had testified for the defendant concerning the type and use of gas guns, that he was present in the warden's office when the county attorney, Mr. Whetsel, interviewed defendant's witness Thompson, the "lever-boy" about the facts of the tragedy and Thompson said that he didn't know anything, that he did not see it, that he was looking the other way.

Counsel for the defendant at the close of all the evidence moved for a directed verdict, which motion was overruled.

We have read the entire record and believe that we have set forth sufficient of the evidence to demonstrate that though there was conflict in the evidence, nevertheless that there was sufficient evidence submitted for the consideration of the jury to support the charge for which the defendant was tried. It was the duty of the jury to decide the factual issues.

In the case of Walker v. State, 89 Okla. Cr. 284, 207 P. 2d 341, 342, a case in line with many previous decisions of this court, we there said:

"1. Where the evidence is conflicting and different inferences may be drawn therefrom, it is the province of the jury to weigh the same and determine the facts.

"2. The function of the Criminal Court of Appeals is limited to ascertaining whether there is a basis, in the evidence, on which the jury can reasonably conclude that the accused is guilty as charged."

It is the theory of the state that the death of W. H. Aston was perpetrated by the defendant with premeditated design to effect his death by crushing his head into the steel wall, and it was the theory of the defense that the injuries sustained by Mr. Aston were caused by pure accident.

Under the issues thus presented, and the evidence adduced, we conclude that the defendant was not entitled to an instruction upon the charge of manslaughter as contended in petition in error.

We have examined the instructions given and do not find that counsel interposed any objections or saved any exceptions to particular instructions. There was one requested instruction, while containing the language of one provision of the applicable statute defining excusable and justifiable homicide, that was so reworded as to not

justify the court in submitting it, and no exception, as stated, was saved as to the instruction by the court given covering defendant's theory of the case.

No fundamental error is found. The judgment and sentence of the district court of Pittsburg county is accordingly affirmed.

JONES, P. J., and BRETT, J., concur.