Robert Lee BOHANON, Plaintiff In Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A-12200.

Criminal Court of Appeals of Oklahoma.

Oct. 26, 1955.

Homer Thompson, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

POWELL, Judge.

The plaintiff in error, Robert Lee Bohanon, hereinafter referred to as defendant, was charged jointly with one James W. Walker with the crime of rape in the first degree, alleged to have been committed by Walker, through connivance with and active aid of Bohanon, on Bohanon's wife. Bohanon was tried first and the jury found him guilty of rape in the second degree, and fixed his punishment at the maximum of fifteen years confinement in the State Penitenitary.

Co-defendant Walker, who testified for the State, was permitted to sign his own bond without co-signers, and it is stated in brief of the defendant that some six jury dockets for trial of criminal cases have been set in Oklahoma County since his release on bail, without Walker being brought to trial.

The charge was based on the provisions of Tit. 21 O.S.1951 § 1111, reading:

"*Rape Defined.* Rape is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, under either of the following circumstances:

\* \* \* \* \* \*

"5th. Where she is prevented from resistance by threats of immediate and great bodily harm, accompanied by apparent power of execution.

\* \* \* \* \* \*

"8th. \* \* \* And in all cases of collusion between the accused and the husband of the female, to accomplish such act, both the husband and the accused shall be deemed guilty of rape."

As pointed out by counsel for the defendant, the above statutory provisions have been considered at length in the early case of Myers v. State, 19 Okl.Cr. 129, 197 P.

884, 18 A.L.R. 1057. Also see for further treatment the case of Duggins v. State, 76 Okl.Cr. 168, 135 P.2d 347.

But one proposition for reversal is advanced, and being that "The evidence is insufficient to warrant a conviction."

We have had the benefit of oral argument in this case, and the public defender, Homer Thompson, has filed an excellent brief on behalf of the defendant. His admirable representation of the defendant is to be commended.

The picture disclosed by a careful study of the record is not a pretty one. We deplore the necessity of recitation. Defendant and his wife, according to some five photographs in the record, lived in a slum district of Oklahoma City. There were but two squalid houses nearby. Defendant Bohanon and his wife Myrtle had been married in July, 1945 and had three children, ages 7 and 4 years, and the youngest 20 months of age. They did not have a bath room, the toilet was out side, and at the time the crime charged was alleged to have been committed, the lighting of the house was by candle. In order to pay her rent, the wife took the three children, when the eldest was not in school, to a dump yard some two blocks away each day where she did housework for the owner, who lived in motor bus bodies that were fixed up for a home.

On the morning of the day of the crime in question, defendant left home to pick up a check for work performed for some construction company. His wife did not see him any more until about 8 p. m. that same day. Her husband had knocked on the door and had become impatient when she did not speedily open it, as she was trying to light a candle first. The husband had a sack full of beer and a bottle of gin, and had another man with him, who told her his name was Jimmie Walker. Walker was a young man, 26 years of age. Bohanon was 34 years old and Mrs. Bohanon was 38 years of age.

Mrs. Bohanon testified that she saw that her husband had been drinking and asked him why he did not have his party down town, that she was tired and ill, had worked all day and needed rest. She said that her husband used a profane word and said he did not want to have his party down town, and sat down in the living room, opened a bottle of beer and told her to drink it, and threatened her if she did not. That she was afraid that he was going to strike her, and she took the bottle out of his hand and pretended to drink from it. She said that her three children were in an adjoining room, asleep. That the youngest, then 18 months old, was still on the breast as she did not have food half the time.

Witness further testified that after sitting in the living room a while, her husband motioned for her to come into the kitchen, and he told her that she must have sexual relations with Walker. Said she: "I pleaded with him, but he said I was going to have to go through with it or he would cut my G—— D——— head off, and the G—— D——— kids' heads off and pile them up in the floor together."

Witness further testified:

"A. He [her husband] forced me back in the bedroom and started pulling my clothes off. He said, 'I told you to get those God damn clothes off, and I mean get them off.'

"Q. How were you dressed at the time, Mrs. Bohanon? A. I had on a sweater and blue jeans.

"Q. You say he jerked your clothes off? A. Yes, sir.

"Q. Then what did he do? A. He threw me on the bed.

"Q. And what happened then? A. Well, I looked up and saw Walker standing there in the door and he told Walker to go ahead and have sexual relationships with me.

"Q. Now, the bed you are speaking of now, which room was it in? A. Well, it was in the back bedroom.

\* \* \* \* \* \*

"Q. Now, what happened after the defendant Bohanon invited the defendant Walker to have sex relations with you? A. Walker got on the bed with me, crawled on me, and I begged him

not to go through with it. I told him I was being forced but he didn't pay any attention. He went ahead anyway.

"Q. Did he say anything to you when you asked him not to go through with it? A. No, sir; he didn't.

"Q. Where was your husband at that time? A. I think he was standing right there in the room. I was so confused and scared I couldn't say actually where he was.

"Q. Did Walker have sex relations with you? A. He did.

"Q. Did he succeed in making a penetration? A. Yes, sir.

"Q. What happened after he had finished? A. He got up and after he got up my husband urged him to get back on me and he said he didn't want to, and my husband told him to go ahead and Walker, he kind of got mad and my husband got mad and I thought they were going to fight. Walker said something about going outside and my husband said, 'I will until you get back', and my husband got on me and after he got through he got up and went outside and hunted for Walker and shouted for Walker several times. He said he was going to bring Walker back in there, but Walker had already left. He had missed him."

Witness further testified that she had seen her husband drunk many times, and that he was pretty drunk on this occasion, but acted more like he was doped, or crazy.

Defendant's co-defendant, Walker, testified for the State. He had been represented by the public defender up until four days prior to trial, but said that he did not tell the story over at the justice of the peace court [preliminary hearing], "But I want to tell the truth now." He said that he had met defendant Bohanon off and on for some two years, ran into him on the date of the alleged crime on Reno Street, in Oklahoma City in front of the Wagon Wheel Bar, about 5:30 or 6 P.M., and the two of them went into the bar and had a few beers, after which witness testified that he, Walker, suggested that the two of them

go to the hotel to "get some women", at which time Bohanon told Walker that he, Walker, could stay with Bohanon's wife for $5. Walker further testified that they went to the hotel where a porter told them they did not have any women, so Bohanon and Walker went to the front of the Terminal Hotel where Walker gave Bohanon $5, after which they purchased some gin and beer, and walked to Bohanon's home. Witness further testified:

"Q. What happened after you got to the Bohanon home? A. Well, he knocked on the door and his wife came to the door and let us in, and said, 'Who is with you?' He said 'a friend'. We went on in and he tried to get her to take a drink and she said, 'Why didn't you have your party in town?' We sat down and talked and he tried to make her drink some gin and beer, and she told him it made her sick at her stomach to drink it. She acted like she drank some, but I knew she didn't drink any. We sat there and talked for a while and—

"Q. Where were you sitting? A. Sitting on the divan.

"Q. In what room? A. In the living room.

"Q. Did you know whether or not there were any other people in the house at that time? A. No, sir.

"Q. All right, go ahead. What happened then? A. Robert told me, 'Go ahead and have intercourse with her'. He said, 'I want to watch you.' I said, 'Man, I am not going to do it.' He said, 'We will go in the bedroom there', so him and her got up and went in the bedroom and I followed them, and he threatened her, he told her to pull her clothes off and she wouldn't do it. He threatened to kill her and the kids both, so he made her pull her clothes off and he told me—

"Q. Who took her clothes off? A. Robert made her. He helped her take them off.

"Q. Then what happened? A. Then, he told me, 'Go ahead,' and I went ahead and had intercourse with

her. She told me at the time that it was against her will.

"Q. Was that before or after you had the intercourse? A. Before.

"Q. That was before you even started? A. Yes, sir.

"Q. Did she beg you not to do it? A. Yes, sir.

"Q. Did you say anything to her? A. No, sir.

"Q. But you did have an act of intercourse with Mrs. Bohanon; is that correct? A. Yes, sir.

"Q. Then what happened? A. Well, he said, 'Go ahead', I said, 'No, I am not going to do it no more'. He said, 'Well if you don't want to, I will', and he throwed her back on the bed, and I walked off and came back to town.

"Q. Where was the defendant, Bohanon, while you were engaged in the act of intercourse with Mrs. Bohanon? A. He was standing at the head of the bed.

"Q. Was there anybody else in the room? A. No, sir.

*    *    *    *    *    *

"Q. Did Mrs. Bohanon struggle with you in any way? A. Yes, sir.

"Q. Were you able to overcome her struggles? A. Yes, sir.

*    *    *    *    *    *

"Q. How long do you think you were in the house? A. Oh, we were there, I imagine, about an hour and 45 minutes or two hours, something like that."

This ended the evidence for the State.

The defendant Bohanon testified in his own behalf that he was 34 years of age, that he met the co-defendant Walker on Reno and Robinson Streets, Oklahoma City, and specifically denied any conversation in connection with co-defendant Walker having intercourse with Bohanon's wife; that at no time did Walker give him any money, but on the other hand at the time he met Walker, Walker stated that he was broke, and Bohanon handed Walker two fifty cent pieces.

Defendant further testified that on the morning of the alleged crime he went to his employer to get his pay check, that he did get his pay check and returned to town where he happened to meet Walker but at no time did he go to any hotel with Walker seeking or looking for women or girls. He further testified that he did invite Walker to his home after buying some beer, and specifically denied that Walker at any time had sex relations with his wife. The next morning his wife prepared breakfast after he had gone to the store and bought groceries, and that no mention was made by her that morning of any such occurrence having happened the night before.

Defendant Bohanon further testified that he knew of two reasons that his wife might have in preferring a charge of this kind against him: First, so that she and her ex-husband could go back together; and second, "She said she was going to try to get rid of me so that she could get on this welfare and get dependent child aid. She said she could get along better without me, that she was going to try to send me to the penitentiary if she ever got anything on me where she thought she could."

On cross-examination the defendant reiterated his testimony given on direct examination and considerable time was consumed by the county attorney in an attempt to trace the money which the defendant had obtained from his employer.

It was brought out on cross-examination of the defendant that in 1948 he had entered a plea of guilty to a charge of child-abandonment brought by his wife, Myrtle Bohanon, and received a one year suspended sentence, and on re-direct examination the defendant testified that after said conviction and ever since that time he had at all times lived with his wife and children. He further testified that since the date of this alleged crime his wife had filed another child abandonment charge against him, and also a divorce action.

As a rebuttal witness, the State produced Albert S. Roberts, head jailer of the Oklahoma County jail, with his records to show the amount of money the defendant

had on his person at the time he was booked in to said jail to be $5.53.

The defendant Bohanon testified in his own behalf in surrebuttal and attempted to explain the discrepancy shown by the records at the county jail.

A consideration of the evidence for the State discloses that if the testimony of its witnesses is to be believed, defendant did procure and conspire with Walker and that there was collusion between them whereby Walker was to and did have sexual intercourse with defendant's wife, Myrtle Bohanon, against her will and over her protest, and that her resistance was overcome by force and fear. But if the defendant's evidence was to be believed, his wife was only seeking to get rid of the husband and testified falsely.

The problem of the jury was to determine who they would believe, and by their judgment they rejected defendant's explanation. The facts and circumstances brought out were just too strong against defendant, and his past record for drunkenness, family desertion and brushes with the law apparently rendered his evidence unworthy of the credence it otherwise might have

had. At all events, the jury found against defendant, and there is nothing in the record to justify this court in interfering with that verdict and the judgment based thereon. This court has often said that where the evidence is conflicting and different inferences may be drawn therefrom it is the province of the jury to weigh the same and determine the facts. Woods v. State, 92 Okl.Cr. 53, 220 P.2d 463; Mayberry v. State, 94 Okl.Cr. 301, 238 P.2d 362; Toms v. State, 95 Okl.Cr. 60, 239 P.2d 812; Lyons v. State, 94 Okl.Cr. 288, 234 P.2d 940. And in Wheeler v. State, 85 Okl.Cr. 248, 187 P.2d 266, we said:

"The Criminal Court of Appeals will not set aside a verdict of guilty rendered in a rape case merely because the evidence of the State and the defendant is highly conflicting, but will only interfere where the material evidence of the State bears upon its face inherent evidence of improbability."

See also Garrison v. State, 57 Okl.Cr. 230, 47 P.2d 224; Jackson v. State, 77 Okl. Cr. 160, 140 P.2d 606.

The judgment appealed from is affirmed.

JONES, P. J., and BRETT, J., concur.